(No. 44461.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. WILLIAM LEE, Appellant.

*Opinion filed April 2, 1973.*

WARD, J., took no part.

ROBERT W. HALLOCK, of Chicago, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE, Assistant State's Attorney, and JOHN C. O'ROURKE, JR., Senior Law Student, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

In May of 1967, a jury in the circuit court of Cook County found the defendant, William Lee, guilty of murder. He was sentenced to death. On appeal the death sentence was set aside under *Witherspoon v. Illinois (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.* The judgment of conviction was also vacated and the cause was remanded for a hearing at which the State would be given an opportunity to show that the in-court identifications of the defendant had an origin independent of the improperly suggestive identification procedures that had taken place. (*People v. Lee (1969), 44 Ill.2d 161.*) On remand the trial court heard evidence and then reinstated the conviction and sentenced the defendant to imprisonment for not less than 30 nor more than 50 years. The case is again here on direct appeal.

The murder for which the defendant was convicted occurred about 2:00 P.M. on January 13, 1966, during the robbery of J. P. Graziano, Inc., a wholesale grocery store located at the corner of Randolph and Peoria Streets in Chicago. Two Negro men, one "real tall, more like a giant" and the other a "little short fellow," entered the store and walked to the office at the rear. One of the men then shot an employee in the back with a shotgun. The employee, Gaetano Pampinella, eventually died from this wound. The shorter man took money from the owner's pocket and from a cash drawer, and the two men forced the occupants of the store to lie down on the floor. As they were leaving by the front door, Police Officer Neil Francis entered the store and walked past them. The two men continued out the door. The officer learned of the robbery and shooting, and began to pursue the two men. As he reached the corner in front of the Graziano store he saw the men about 20 feet away getting into an automobile. He managed to fire three shots at them before the car sped off.

Shortly thereafter, an automobile with three bullet

holes in the back and a shotgun on the rear seat was discovered by a police officer four blocks south of the Graziano store. The car, which had been stolen earlier that day, had been abandoned after striking another car. At about the same time, three blacks engaged a taxi approximately four blocks from the scene of the automobile accident and were driven to a location on the west side of Chicago.

A few days after the shooting the police arrested Lawrence Anderson, who implicated the defendant in the crime. At his trial the defendant was identified as the taller of the two gunmen by two witnesses—Fred Graziano, the son of the owner of the grocery store, and Officer Francis. The owner of the store, James Graziano, then 76 years old, also identified the defendant as the taller gunman, but his identification was extremely weak. He was unable to identify the defendant when he was within four feet of him, and then he identified someone in the courtroom other than the defendant. He did not identify the defendant until the defendant stood up in the courtroom at the request of the prosecutor.

Three other persons who were present in the store at the time of the shooting testified at trial, but none of them identified the defendant. Angeline Alioso, a bookkeeper at the store, testified that after she heard a loud noise she looked up and saw a rather tall Negro standing about four or five feet away from her with something in his hand. She stated that she then stooped behind her desk. She was unable to give any further description of the man and stated that she would be unable to identify him. Margaret Incavo, a clerk at the store, testified that she heard a blast and then stooped behind her desk. She apparently did not see the gunmen. Tony Genna, a friend of James Graziano, testified through an interpreter that immediately after he heard a strong noise a tall black man with a rifle grabbed his arm and led him into a smaller office located behind the main office. He stated that the man asked him for

money and then left the room. Despite the fact that he looked at the tall man's face, Genna could not identify the defendant in the courtroom after the defendant was required to stand up. All he could say was that the defendant was the same size as the taller gunman.

The State also presented the testimony of Raymond Nault, a truck driver, and Louis Austin, a cab driver. Nault testified that at approximately 2:00 P.M. on January 13, 1966, while parked at Peoria and Adams Streets in Chicago, he saw, from a distance of 10 feet, three Negro men "galloping" away from an automobile accident. The only description of the men that he could give was that one was real tall and the other two were of medium height, and that all three were wearing black leather jackets and were bareheaded. He further testified that about a week later the police showed him some photographs but he was unable to identify any of them.

Austin testified that at about 2:00 P.M. on the day in question three Negro men entered his cab at Jackson Boulevard and Sangamon Street in Chicago and that he drove them to a location on Hamlin Avenue. The only description he could give of the three men was that one was taller than the other two. Although he testified that the taller man paid the fare, he was unable to identify the defendant as that man. He could only say that the defendant was about the same height and build as the man who had paid him.

From this summary of the evidence it is clear that the only substantial evidence connecting the defendant with the crime was the identification testimony of Fred Graziano and Officer Francis. The considerations that made it impossible to sustain the judgment of conviction were thus stated in the opinion of the court in the earlier appeal:

> "It was stipulated by the State that, following his arrest and during the hours that defendant was in the immediate custody of the police, he

asked for and was denied the services of a lawyer. Actually, defendant had no counsel until March 11, 1966, when the public defender was appointed for him. It was during this period that the police arranged identification procedures which defendant argues were so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny him due process of law.

The first of these occurred January 26 when defendant was being held in a cell adjacent to and behind the felony courtroom at 2600 South California awaiting preliminary hearing. Officer Neil Francis testified that this cell, referred to as a bullpen, was about 10 feet wide and 15 feet long, and it was then occupied by about 25 men including both Caucasians and Negroes. Officer Francis said he walked back to the restricted area of the bullpen and that when he saw the defendant he pointed and said: 'William Lee, come here.' Then the officer asked: 'Have you ever seen me before?' The defendant said nothing and walked away.

The second confrontation which defendant complains of occurred March 1, 1966, at a coroner's inquest as to the cause of decedent's death. Fred Graziano testified that prior to the inquest he received a phone call from the Chicago Police Department and was told he should come to the coroner's inquest because the police 'had the guys that did it, come on down and identify them.' He informed his father of this communication and they both appeared at the inquest. While they waited in the hearing room the defendant was brought in handcuffed to Lawrence Anderson, a man whom both had previously identified in a lineup as the 'short guy'. Both Grazianos saw the defendant handcuffed to Anderson.

\* \* \*

The defendant contends that the circumstances of the confrontation at the inquest, where he was seen handcuffed to a previously identified participant in the crime, were 'inherently tainted with unfair suggestion.' There is a dangerous degree of suggestion by association where a suspected accomplice is viewed together with a person previously identified by the viewers as a perpetrator of the crime. (See *People v. Blumenshine, 42 Ill.2d at 512.*) This suggestive influence was even greater here where the confrontation was preceded by the remarks of the police to Fred Graziano and related by him to his father.

The test is whether the identification procedures were 'unnecessarily' suggestive and the methods used must be examined in light of the circumstances in each case. In *Stovall v. Denno, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967,* the police conducted an admittedly suggestive showup before the only eyewitness, the seriously wounded victim whose survival was uncertain. This confrontation was held not unnecessarily suggestive but 'imperative'. (388 U.S. at 302, 18 L. Ed. 2d at 1206, 87 S. Ct. at 1972.) However, there were no such circumstances compelling use of the procedures employed here. The defendant had been arrested and in custody for more than a month prior to the coroner's inquest. No reason is offered why the defendant was not viewed in a properly conducted lineup at an earlier date nor are there circumstances to be found justifying the unusually suggestive viewing conducted at the inquest."

Officer Francis had testified at the defendant's trial that before he spoke to the defendant in the bullpen at felony court he had identified a photograph of the defendant as depicting the taller of the two men he had

seen leaving the Graziano store immediately after the shooting. The circumstances under which that photographic identification took place were not brought out, however, until the hearing on remand. There Officer Francis testified that before he made the photographic identification other police officers had told him that Lawrence Anderson, whom Francis had already identified as the shorter of the two participants in the crime, had implicated someone else. The officers then showed him nine photographs of Negroes. Included in the group of photographs was one picture of a woman and one picture of Lawrence Anderson. In effect, this reduced the number of photographs to seven. Of these seven, three were photographs of the defendant. It is difficult to imagine more suggestive circumstances surrounding a photographic identification. We agree with the trial court that "where it's three photographs of the defendant incorporated in the series of photographs that in my opinion is as highly suggestive as any type of confrontation could be."

During the interval between the defendant's trial and the hearing on remand, James Graziano had died. As we have indicated, his testimony at the trial was not significant.

During the week following the robbery, Fred Graziano had viewed approximately 300 photographs shown to him by the police, without making an identification. Finally, on January 21 or 22, two months before the confrontation at the coroner's inquest, he identified a photograph of the defendant as that of the taller of the two robbers. The identification of this photograph, however, was made under circumstances virtually identical to those under which Officer Francis identified the defendant's photograph. Fred Graziano had already identified Lawrence Anderson as one of the assailants. And before showing him the photographs, the police had told him that someone else had been implicated. They then showed him the same nine photographs that they had shown to Officer Francis.

Of the nine, one was of a woman, one was of Lawrence Anderson, and three were of the defendant. As in the case of Officer Francis, this unnecessarily suggestive procedure enhanced the likelihood of mistaken identification.

The testimony of these witnesses on remand with respect to their opportunity to observe the robbers did not differ significantly from that which was before the court upon the earlier appeal. Indeed, if anything, that testimony underscored the likelihood of misidentification, since it removed the possibility that the initial identifications had been made from fairly conducted, unslanted, photographic lineups. On remand Officer Francis testified that when he first entered the store he observed the man whom he identified as the defendant as they stood face to face for approximately 30 seconds, under good lighting conditions, at a distance of about three feet. At that time, however, he did not know a crime had been committed, and, indeed, he had testified earlier that he thought the two men whom he saw leaving the store as he was entering were employees.

We have carefully considered the evidence presented at the hearing on remand, and we have concluded that the State did not meet its burden of proving by clear and convincing evidence that the in-court identifications of the defendant had an origin independent of the improperly suggestive methods that were used in bringing about that identification. The judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial at which the identification testimony of Fred Graziano and Officer Neil Francis must be suppressed.

*Reversed and remanded, with directions.*

MR. JUSTICE WARD took no part in the consideration or decision of this case.