THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
DARRYL JORDAN, Defendant-Appellee.

First District (3rd Division)   No. 82—1345

Opinion filed December 30, 1983.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Paula Carstensen, and Thomas J. Finn, of counsel), for the People.

Patrick E. McGann, of Oak Lawn, for appellee.

JUSTICE McGILLICUDDY delivered the opinion of the court:

The defendant, Darryl Jordan, was charged by information with the offenses of rape, deviate sexual assault, armed robbery, aggravated kidnaping, unlawful restraint and armed violence. (Ill. Rev. Stat. 1981, ch. 38, pars. 11—1, 11—3, 18—2, 10—2(a)(3), 10—3(a), and

33A—2.) Prior to trial, defendant filed a motion to suppress identification. After a hearing during which the facts were stipulated to by the parties, the trial court granted that motion. The State appeals, contending that it was manifest error for the trial court to sustain the motion to suppress identification since that ruling directly conflicts with controlling Illinois law and since the identification was shown to be reliable. 87 Ill. 2d R. 604(a)(1).

The following facts were stipulated to at the hearing on defendant's motion to suppress identification: On May 9, 1980, at approximately 5:30 p.m., the victim was about to get into her car, which was parked in the Evergreen Plaza parking lot. At that time a black male came up to her and forced her into the vehicle. The assailant then drove her around various streets and localities. During this time, he raped her and forced her to perform oral copulation on him. The entire incident lasted for approximately one hour, during 30 minutes of which the victim was able to clearly observe her assailant.

Shortly after the offenses had taken place, the victim went to a hospital in Oak Lawn where she was interviewed by Evergreen Park police officers. The victim informed the officers about the events, and she also gave them a physical description and a clothing description of the assailant. She described her assailant as a 25-year-old black male who was approximately 5 feet 7 inches in height and weighed about 140 pounds. She said that her assailant was clean-shaven, had black hair that was cut short in an Afro style and had sideburns. The victim also told the officers that the offender wore a waist-length, forest-green, winter-type jacket, dark pants and black shoes with white mesh on top. The victim further related that the assailant wore a watch on his left arm and had a high school ring on his hand. However, the victim could not describe the offender's facial features with specificity.

On May 12, 1980, police officers went to the victim's home and again interviewed her. The next day, the victim retraced the route of the incident as best as she could for the police. At that time, the victim was also shown a photograph display, but she could not identify anyone in that display as her assailant. At the suppression hearing, defense counsel stated that if called to testify, Officer Watson would state that a police report indicated that defendant's picture was in the aforesaid photographic display. The assistant State's Attorney, however, said that if Officer Viggiani were called to testify, he would state that the police report indicated that the victim viewed consecutive mug shots, numbered 77—99 through 80—557. However, defendant's mug shot, numbered 80—552, was not contained in that display.

Therefore, the police report was mistaken in that regard.

Because the victim felt that the trauma of the incident caused a mental block in her recall of the assailant's exact facial features, she believed she could remember them best if she was hypnotized. On May 19, 1980, Stan Mitchell, a hypnotist with over 30 years experience, placed the victim under hypnosis during which he asked the victim general questions about the incident and her assailant's features. It was stipulated that Mitchell in no way suggested anything to the victim, and that the facial features of the victim's assailant were not given to an artist but were merely recalled by the victim. Two days later, the victim went to the Evergreen Park police station and helped a police artist draw a composite picture of her assailant.

On May 29, 1980, John Stevens, a member of the Illinois Department of Law Enforcement, placed the victim under hypnosis. It was stipulated once again that the victim was asked only general questions about the incident and her assailant's facial features and nothing was suggested to her. A composite drawing was then made while the victim was under hypnosis.

On June 19, 1980, the victim called the police and informed them that she had seen her assailant riding in a car on 95th Street in Chicago. She was able to give a partial description of the license plate and also a description of the vehicle in which the assailant was riding. Although the police followed up on this information, they were unable to obtain any new leads. On July 17, 1980, the victim was again placed under hypnosis in an attempt to get a better description of the license plate she had seen on June 19. Although a full license plate number was elicited under hypnosis, no arrest resulted from that information.

On September 22, 1980, the police called the victim and at that time she informed them that she had seen her assailant on September 20 at a hot dog stand located near the intersection of 99th Street and Western Avenue. This time the victim copied down the license plate number of the car in which her assailant was sitting, and she gave that number to the police. The police checked the number, and it was registered to defendant. The police then compiled a photographic array consisting of 10 photographs of black males, including defendant's photograph. After having viewed this array, the victim selected the picture of defendant as her assailant. Defendant was then arrested and brought to the police station. On the same date, the victim viewed a five-man lineup and selected defendant as the man who had raped her.

After hearing the arguments of counsel, the trial court held that

the victim's identification was tainted by the hypnosis that she had undergone five months prior to her identification. The trial court concluded that her identification was *per se* inadmissible, and therefore, sustained defendant's motion. Thereafter, the case was stricken with leave to reinstate.

In the present matter, the trial court specifically rejected the holding of the Fourth District Appellate Court in *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848, and ruled that the identification testimony of the witness, which was obtained subsequent to her being hypnotized, was *per se* inadmissible since she was incompetent to testify as to subjects inquired into under hypnosis. (See *People v. Shirley* (1982), 31 Cal. 3d 18, 641 P.2d 775, 181 Cal. Rptr. 243.) On appeal, the State contends that *People v. Smrekar* is the law in Illinois since it has never been overruled or modified. Therefore, the State concludes that the trial court erred in refusing to follow controlling Illinois law.

Defendant contends that the trial court acted properly since the most recent cases on this issue indicate that such testimony is *per se* inadmissible. Defendant further argues that the victim's testimony should also have been excluded because the hypnosis did not satisfy the safeguards for the admission of hypnotically enhanced testimony set out in *State v. Hurd* (1981), 86 N.J. 525, 432 A.2d 86.

An extensive review of the case law authority, regarding the admissibility of testimony by a witness who has undergone hypnosis, indicates that no unanimity has been reached on the issue. Some jurisdictions hold that previous hypnotism of a witness is a matter which affects only the credibility of that witness' testimony and does not bear upon the admissibility of that testimony. (See *United States v. Adams* (9th Cir. 1978), 581 F.2d 193.) Another approach permits the introduction of testimony refreshed through hypnosis upon a preliminary showing that the use of hypnotism is likely to restore memory comparable in accuracy to normal recall and that a certain standard has been followed in eliciting such recall. (See *State v. Hurd; People v. Smrekar*.) Other jurisdictions have determined that a witness who has been hypnotized prior to trial is incompetent to testify to events occurring during hypnosis or to the results of the hypnotic procedure. See *People v. Shirley*; see also *State v. Mack* (Minn. 1980), 292 N.W.2d 764.

This latter approach, frequently uses the rationale that hypnotism presents the same issues of admissibility as are created when the results of a lie detector test or other scientific tests are sought to be admitted. In order for the result of a scientific procedure to be admit-

ted into evidence, there must be a demonstration that the procedure has been generally accepted as reliable in the scientific community in which it was developed. Since the consensus of opinion among that community is that hypnosis is not a reliable technique for producing historically accurate recall, it becomes necessary to conclude that testimony enhanced through hypnosis is inadmissible *per se.*

Many of the jurisdictions, which have excluded testimony generated by hypnotically expanded recall, have modified their positions in that a witness may nevertheless testify regarding those matters which he or she was able to recall and relate prior to hypnosis. (See *People v. Jackson* (1982), 114 Mich. App. 649, 319 N.E.2d 613.) For a detailed discussion of the various approaches taken by other jurisdictions involving the admissibility of hypnotically refreshed testimony, see the discussions in the recent decisions of *State v. Collins* (1983), 296 Md. 670, 464 A.2d 1028, and *State v. Brown* (N.D. 1983), 337 N.W.2d 138.

In *People v. Smrekar*, the witness to an arson-murder was hypnotized by a physician in order to aid her in refreshing her recollection of the offense so that she might be able to identify the arsonist. Prior to being hypnotized, the witness described the probability of identifying the arsonist as "50-50," but after undergoing the hypnotic procedure, she was able to make a positive and certain identification. On appeal, this court held, with one justice dissenting, that the fact that the witness had been hypnotized prior to trial affected only the weight of the evidence and not the admissibility of the identification. The court found that the identification testimony had been properly admitted since the record on appeal demonstrated: (1) that the hypnotist was competent, having used hypnosis in his medical practice for 10 years; (2) that the procedure was not fraught with suggestive influences; (3) that the witness' identification was corroborated by other substantial evidence unknown to the witness when she made the identification; and (4) the evidence showed that, at the time of the occurrence, the witness had sufficient opportunity to observe the arsonist. (*People v. Smrekar* (1979), 68 Ill. App. 3d 379, 388, 385 N.E.2d 848.) Defendant maintains that *Smrekar* does not have any remaining validity because it has in effect been overruled by the *per se* cases, such as *People v. Shirley.*

However, the Fourth District Appellate Court, in *People v. Gibson* (1983), 117 Ill. App. 3d 270, 274-76, 452 N.E.2d 1368, has recently reaffirmed its holding in *Smrekar.* The court stated:

"For the reasons which follow, we adhere to *Smrekar* because we believe that it strikes the proper balance between the

possible benefit in the use of hypnosis as an aid in refreshing recollection and the disadvantages and problems associated with its use. ***

The general acceptance in the community test is not applicable to the admission of hypnotically enhanced testimony because that standard is concerned with the admission of expert opinion deduced from the results of a scientific technique and not the admissibility of eyewitness testimony. Secondly, application of that standard would single out hypnotically refreshed testimony and impose a requirement that the scientific community agree as to its accuracy in aiding recall, whereas a similar standard is not imposed on ordinary eyewitness testimony not refreshed through hypnosis [citation]. Finally, application of this test focuses on the general reliability of the procedures, thereby obscuring the more important question of whether the procedure used in a given situation was reliable and nonsuggestive. Notwithstanding the substantial authority excluding the testimony of a witness who has undergone hypnosis, we believe that requiring the State to choose between the use of hypnosis on a witness to aid in the resolution of a difficult case and the use of that witness at trial exacts too high a price." 117 Ill. App. 3d 270, 274-76.

The court in *Gibson* further indicated that it would not adopt *in toto* the procedural standards suggested in *Hurd*. In *Hurd*, the New Jersey Supreme Court held that a trial court must first insure that the use of hypnosis in a particular case is reasonably likely to result in recall comparable in accuracy to normal human memory. Secondly, a six-point procedural standard had to be followed. The six requirements are: (1) a psychiatrist or psychologist experienced in hypnosis must conduct the session; (2) the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecution or defense; (3) any information given to the hypnotist must be recorded; (4) before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them and the hypnotist should carefully avoid influencing the description through leading questions; (5) all contacts between the hypnotist and the subject must be recorded; and (6) only the hypnotist and the subject should be present during the entire hypnotic session which should be recorded on video tape. The *Gibson* court held that the four-part test in *Smrekar* adequately addressed the same dangers as the procedural standards suggested in *Hurd* in the use of hypnotically-refreshed testimony. (*People v. Gibson* (1983),

117 Ill. App. 3d 270, 277, 452 N.E.2d 1368.) The court felt that by allowing the defendant to present expert testimony to the jury to show that hypnotism of a witness may influence that witness' recollection, the trier of fact nevertheless could adequately assess credibility of the testimony from that perspective. The court stated:

> "Protection against the possibility of confabulation, distortion, and the 'hardening' of a witness' memory is also insured by requiring the trial court to find that the *Smrekar* requirements are satisfied. If either the State or defense propose to introduce the testimony of a previously hypnotized witness, specific notice of such fact should be given to the opposite party so that a timely suppression motion can be made and ruled on in light of the four-part test we adopted in *Smrekar*." (117 Ill. App. 3d 270, 277-78.)

However, the court also concluded that *Smrekar* requires, as a part of the requirement that the hypnotist be competent, a subsidiary showing in line with *Hurd*, that the witness is independent of and not closely associated with either the prosecution or defense. The court stated that it also discouraged the practice of allowing police personnel and the assistant State's Attorney to be present during the interview since the possibility of suggestive influence is only compounded. (117 Ill. App. 3d 270, 278.) The *Smrekar-Gibson* approach has recently been accepted, as modified, by the Fifth District Appellate Court. (*People v. Cohoon* (1983), 120 Ill. App. 3d 62.) Although the *Cohoon* court accepted the *Gibson* court's reaffirmation of *Smrekar's* rejection of the *per se* inadmissibility rule, it did not accept the *Gibson* court's application of the *Smrekar* standards. Specifically, the *Cohoon* court rejected the conclusion that a person with training in hypnosis is incompetent solely because he is a police officer.

Here, the majority of the requirements of the *Smrekar* test have been adequately satisfied by the State. In the present matter, the two hypnotists were not certified as hypnotherapists, but both had extensive backgrounds in the use of hypnosis. (*People v. Cohoon*.) It was also stipulated that neither hypnotist used any type of suggestive questioning during the hypnosis of the victim. The record suggests that the victim's identification was corroborated by the extensive clothing and physical descriptions given to the police prior to the hypnosis. In addition, it was further established that the victim was with her assailant for more than an hour, and therefore, had an adequate opportunity to view him. However, it was also established that one of the two hypnotists was employed by the Illinois Department of Law Enforcement and that certain police personnel may have been present

during the hypnotic sessions. We feel that this presents a question to be initially resolved by the trial court of whether or not the State's use of this particular hypnotist would prevent the admission of the victim's identification testimony. (*People v. Cohoon.*) The same is true for the presence of police personnel during the sessions.

Therefore, the trial court's order, suppressing the victim's identification, will be vacated and the cause remanded for an evidentiary hearing to determine these issues.

Vacated and remanded.

McNAMARA, P.J., and WHITE, J., concur.